# DEPARTMENT OF BUSINESS REGULATION, DIVISION OF ALCOHOLIC BEVERAGES AND TOBACCO v MORA and ARISTIDES, etc.

## Case Nos. 88-1604 and 88-1608

State of Florida, Division of Administrative Hearings

April 29, 1988

## APPEARANCES OF COUNSEL

**Thomas A. Klein,** Department of Business Regulation, for petitioner.

**Felix Aristides,** *pro se*

## OPINION OF THE COURT

WILLIAM J. KENDRICK, Hearing Officer.

### *RECOMMENDED ORDER*

Pursuant to notice, the Division of Administrative Hearings, by its

duly designated Hearing Officer, William J. Kendrick, held a public hearing in the above-styled cases on April 12, 1988, in Miami, Florida.

## PRELIMINARY STATEMENT

At issue in this proceeding is whether controlled substances were possessed, sold, or used in the licensed premises and, if so, whether respondents' alcoholic beverage licenses should be revoked or otherwise disciplined.

At hearing, petitioner called as witnesses: Tom Hunker, Walter Campbell, Oscar Santana, and Beverly Jenkins. Petitioner's exhibits 1 and 2 were received into evidence. Respondents called Felix Aristides Mora as a witness, but offered no exhibits.

The hearing transcript was not ordered by the parties, and they were granted leave until April 26, 1988, to file proposed findings of fact. Petitioner elected to file proposed findings, and they have been adopted in substance in this recommended order.

## FINDINGS OF FACT

1. At all times material hereto, Respondents, Alejandrina Mora and Felix Aristides, held alcoholic beverage license number 23-4816, series 2-APS, and 23-8295, series 2-COP, for the premises known as Las Tunas Market and Cafeteria, 628-30 6th Street, Miami Beach, Florida.

2. In March 1988, Petitioner, Division of Alcoholic Beverages and Tobacco (DABT), in conjunction with the Miami Beach Police Department (MBPD), began a narcotics investigation at the licensed premises. Previously, Sergeant Tom Hunker and Detective Walter Campbell of the MBPD had made several drug arrests at the licensed premises, and had warned the owners to stop such activities on their premises or their licenses would be subject to revocation.

3. On March 8, 1988, DABT Investigator Oscar Santana, operating undercover, entered the licensed premises. During the course of his visit, he observed a male patron known as Junior sell what appeared to be rock cocaine to several booths both on and off the licensed premises.

4. After observing the foregoing transactions, Investigator Santana approached Junior and asked him if he had any more to sell. In response, Junior handed Santana two crack cocaine rocks, for which Santana paid Junior $20. This transaction occurred in plain view of respondents' employee Gonzalo.[1]

---

[1] All substances received by the investigator were laboratory analyzed and proved positive for cocaine or marijuana. In those circumstances where the investigator did

5. On March 9, 1988, Investigator Santana returned to the licensed premises. Upon entering, Santana was approached by Junior who inquired as to whether he would be interested in purchasing some more cocaine. Santana responded affirmatively, and handed Junior $20. Junior then left the premises for a short time, and when he returned handed Santana two crack cocaine rocks. This transaction occurred at the counter, and in plain view of respondents' employee Gonzalo.

6. After the foregoing transaction, Investigator Santana was approached by another patron known as Paul, who inquired whether he would be interested in buying some cocaine. Santana agreed to buy from Paul if he brought it to the licensed premises. Paul left the premises, returned shortly thereafter, and met Santana just outside the door. At that time, Santana paid Paul $30 in exchange for two crack cocaine rocks. During the course of this transaction, respondents' employees Ricky and Gonzalo were nearby.

7. On March 10, 1988, Investigator Santana returned to the licensed premises. During the course of his visit, Santana met with a patron known as Charlie, who offered to sell him some cocaine. Santana handed Charlie $20 and observed him leave the premises, walk across the street, and hand the money to another individual. Shortly thereafter, Charlie returned to the licensed premises and delivered the cocaine rocks to Santana. The exchange between Santana and Charlie took place in plain view and in the presence of respondents' employee Nene.

8. On March 17, 1988, Investigator Santana returned to the licensed premises. Also on the premised that day were DABT Investigators Jenkins and Elkin, operating separately from Santana to provide backup for him.

9. As he entered the premises, Santana seated himself with Junior and respondents' employee Ricky at a table by the front door. There, in front of Ricky, Santana purchased a cocaine rock from Junior for $20. Ricky, suspicious of Jenkins and Elkin, two female non-latins, warned Santana to be careful because the two females were police officers.

10. On March 18, 1988, Investigator Santana returned to the licensed premises. Investigators Jenkins and Elkin, again operating separately from Santana, were also on the premises that day.

not actually receive the substance, and analysis was not possible, I conclude that the "rocks" being sold were cocaine since it appearance was consistent with that of cocaine, was sold by persons who sold cocaine to the investigator, and was being sold where cocaine was sold on a regular basis. *See: A.A. v State,* 461 So.2d 165 (Fla. 3d DCA 1985).

11. Upon entering the premises, Santana was approached by a patron known as Reyna, who inquired whether he was interested in purchasing some cocaine. Santana responded yes, handed Reyna $25, and Reyna left the premises.

12. After Reyna left the premises, Santana seated himself at the front table. When Reyna returned, she sat down at the table with him and delivered, above the table, two cocaine rocks. This transaction took place in front of respondents' employee Ricky, who again warned Santana to beware of the police officers (Investigators Jenkins and Elkin).

13. Later that day, Santana gave Junior $20 to purchase cocaine for him. When Junior delivered the rock cocaine to Santana it was done in plain view and in the presence of respondents' employees Gonzalo and Ricky.

14. During the course of this visit to the premises, Investigators Jenkins and Elkin, also undercover, were seated separately from Santana. At some point they were joined by a male patron who later gave them two marijuana cigarettes. The investigators retired to the women's bathroom and burnt a marijuana cigarette to see what, if any, response it would bring. While one of the respondents' employees entered the bathroom after they left, the aroma of marijuana brought no response.

15. On March 21, 1988, Investigator Santana returned to the licensed premises. Upon entry, Santana, respondents' employee Gonzalo, and two black latin male patrons were the only persons present. These patrons approached Santana and inquired if he was interested in purchasing marijuana. Santana responded yes, and paid the men $20 for approximately one ounce of marijuana. This transaction occurred in plain view, and in the presence of Gonzalo.

16. On March 24, 1988, Investigator Santana returned to the licensed premises. During the course of his visit he met with Junior inside the bathroom, and purchased two cocaine rocks for $40.

17. On March 25, 1988, Investigator Santana returned to the licensed premises. Santana was approached by Junior who inquired whether he was interested in purchasing some cocaine. Santana handed Junior $40, and Junior left the premises to get the cocaine. Upon his return, Junior placed the cocaine rocks on the counter in front of Santana. This transaction occurred in plain view, and in the presence of respondents' employees Gonzalo and Ricky.

18. All of the event summarized in the preceding paragraphs took

place at the licensed premises during normal business hours. At no time did respondents' employees express concern about any of the drug transactions. In fact, the proof demonstrates that all of the employees knew that marijuana and cocaine were being sold on the licensed premises on a regular, frequent and flagrant basis. Neither respondents, who were on notice of such activities, nor any of their employees, took any action to prevent, discourage, or terminate the sale of any controlled substance.

## CONCLUSIONS OF LAW

1. The Division of Administrative Hearing has jurisdiction over the parties to, and the subject matter of, these proceedings.

2. Section 561.29(1), Florida Statutes, authorizes DABT to revoke or suspend a beverage license upon a showing of:

(a) Violation by the licensee or his or its agents, officers, servants, or employees, on the licensed premises . . . of any of the laws of this state or of the United States . . . or engaging in or permitting disorderly conduct on the licensed premises, or permitting another on the licensed premises to violate any of the laws of this state or of the United States . . .

\* \* \*

(c) Maintaining a nuisance on the licensed premises.

3. Section 823.10, Florida Statutes, declares a place or building where controlled substances are illegally sold or delivered to be a public nuisance. Marijuana and cocaine are controlled substances. Section 893.03, Florida Statutes. It is a violation of state law, under the circumstances of this case, to sell, deliver or possess marijuana or cocaine. Section 893.13, Florida Statutes.

4. The proof is clear and convincing that patrons of the licensed premises possessed, sold, and delivered controlled substances on the licensed premises in violation of the law. In the instant case, the violations of law were so numerous and flagrant as to compel the conclusion that respondents fostered, condoned or negligently overlooked them. *Lash, Inc. v State, Department of Business Regulation,* 411 So.2d 276 (Fla. 3d DCA 1982), and *Pauline v Lee,* 147 So.2d 359 (Fla. 2d DCA 1962). Under such circumstances, the evidence supports the revocation of respondents' licenses.

## RECOMMENDATION

Based on the foregoing findings of fact and conclusions of law, it is

RECOMMENDED that the Division of Alcoholic Beverages and

239

Tobacco enter a final order revoking alcoholic beverage license number 23-4816, series 2-APS, and alcoholic beverage license number 23-8295, series 2-COP, issued to Alejandrina Mora and Felix Aristides d/b/a Las Tunas Market and Cafeteria, for the premises located at 628-30 6th Street, Miami Beach, Florida.

DONE AND ENTERED in Tallahassee, Leon County, Florida, this 29th day of April, 1988.